IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RENITA CHALEPAH, as Personal Representative of the Estate of Zachary Nicholas Bear Heels for the benefit of the Heirs and Next of Kin and as Personal Representative of the Estate of Zachary Nicholas Bear Heels, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF OMAHA, a Nebraska Political Subdivision, et al.,<br><br>Defendants. | 8:18-CV-381<br><br>MEMORANDUM AND ORDER |

The plaintiff is the mother of Zachary Bear Heels, a young man whose life was lost in the early morning hours of June 5, 2017, while in the custody of the individual defendants, all of whom were City of Omaha police officers. On behalf of Bear Heels' Estate and his heirs and next of kin, the plaintiff brings this action pursuant to 42 U.S.C. § 1983 regarding the alleged violation of Bear Heels' Constitutional rights protected by the Fourth and Fourteenth Amendments, and also regarding the defendants' alleged violation of the Americans with Disabilities Act, 42 U.S.C. § 12132. The defendants have moved for partial dismissal of the plaintiff's Complaint pursuant to Fed. R Civ. P. 12(b)(6) and 12(b)(1). The defendants' motion will be denied.

I. STANDARD OF REVIEW

A motion pursuant to Rule 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction

bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). For the purposes of a motion to dismiss a court must take all the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly*, 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. Id. at 556.

## II. BACKGROUND

Zachary Bear Heels was traveling by bus from Murdo, in south-central South Dakota, to Oklahoma City, Oklahoma. Bear Heels suffered with bipolar disorder and schizoaffective disorder and took anti-psychotic medication to help control his symptoms.

Late at night on Saturday, June 3, 2017, Bear Heels was not allowed to re-board the bus after it had stopped in Omaha due to complaints about his conduct from another bus passenger. Filing 1 at 3. The next day, June 4, Omaha Police officers were called to a business located near 60th and Center Street regarding a report of someone licking the windows. The responding officers encountered Bear Heels, who was described as talking quietly and

appeared to be dehydrated. The officers gave him some water and asked if they could take him to a shelter. The officers observed that Bear Heels appeared to be under the influence of drugs or mentally ill, but believed that they did not have a lawful reason to detain him. [Filing 1 at 4](Filing 1 at 4).

That night in the early morning hours of Monday, June 5, defendants Jennifer Strudl and Makayla Mead were dispatched to a convenience store located at 60th and Center Street at around 12:30 a.m. regarding a disturbance involving a person who was refusing to leave. Officer James Mosby was in the area and also responded to the call. Upon arrival, Strudl observed Bear Heels dancing in front of the store. Strudl and Mosby contacted Bear Heels and attempted to obtain his identification and his reasons for being in the area. They observed that Bear Heels' speech was garbled, and he displayed signs of impairment. Strudl and Mosby placed Bear Heels in handcuffs without incident. Mosby was called away to another incident, so Strudl and Mead placed Bear Heels in the back seat of Strudl's police cruiser while they considered how they should proceed. [Filing 1 at 5](Filing 1 at 5). They told Bear Heels they would take him where he wanted to go.

Strudl and Mead ran a records check and learned that on June 4, the plaintiff had reported Bear Heels as missing. Strudl spoke with defendant Sgt. Erik Forehead for advice on what they should do. Forehead believed that Bear Heels did not meet the criteria to be taken into protective custody and that there was an insufficient basis to justify arresting him. Shortly after 1:00 a.m., Strudl called the plaintiff to discuss options for her son. [Filing 1 at 6](Filing 1 at 6). Bear Heels was allowed to talk to his mother. Strudl reported that Bear Heels' speech during this conversation was mostly unintelligible. The plaintiff explained to Strudl that she was doing all she could to get Bear Heels back home to Oklahoma so that she could get him the help he needed. The plaintiff

asked Strudl and Mead to take Bear Heels to a crisis center until she could drive from Oklahoma to pick him up. Mead contacted Sgt. Forehead regarding the plaintiff's request to take Bear Heels to a crisis center. Forehead continued to maintain that there was no justification for Bear Heels to be detained. Strudl and Mead told the plaintiff that they were going to take Bear Heels to the bus station. By this time, Bear Heels had been sitting handcuffed in the back seat of Strudl's cruiser for nearly 40 minutes. Filing 1 at 6.

Around 1:30, defendant Scotty Payne arrived on the scene. Strudl told Payne she was going to take Bear Heels to the bus station and drop him off. However, when Strudl opened the back door of her cruiser to fasten Bear Heels' seatbelt, Bear Heels—still handcuffed behind his back—got out and tried to get away. Strudl, Mead and Payne went after Bear Heels to try and get him back into Strudl's cruiser. They caught him and were able to pin him against a bottled water display, but were unable to get him back to the cruiser. Filing 1 at 7. Defendant Ryan McClarty arrived on the scene while Strudl, Mead and Payne were trying to get Bear Heels back to Strudl's cruiser. McClarty pulled Bear Heels to the ground, and Payne told him that he would be tasered if he did not cooperate. Strudl, Mead, Payne and McClarty started carrying Bear Heels back to Strudl's cruiser when Bear Heels broke free and landed on his feet. Payne shouted "Taser, Taser," McClarty grabbed Bear Heels, and Payne discharged his Taser with the electrodes embedding in Bear Heels' abdomen and right thigh. Filing 1 at 7.

McClarty pulled Bear Heels to the ground again and started dragging him by his ponytail and waistband toward Strudl's cruiser. Mead helped by grabbing Bear Heels' arm. All the while, Payne's Taser electrodes remained embedded in Bear Heels while Payne discharged his Taser approximately six more times. Filing 1 at 8. Bear Heels was placed in a seated position on the

4

ground, with his back against the right rear tire of Strudl's cruiser. Bear Heels was offering no resistance and Payne discharged the Taser three more times. Filing 1 at 8. After hitting Bear Heels with ten Taser discharges,[1] Payne stepped forward and while standing over Bear Heels, who was not resisting, said "You're gonna get it again." Bear Heels was able to free his left hand from the handcuffs and—while still on the ground—swung his arms and legs at McClarty. McClarty jumped on Bear Heels and struck him with a closed fist thirteen times on the head and then attempted to place Bear Heels in a neck restraint. Payne, again, discharged his Taser. Filing 1 at 8.

Soon after subduing Bear Heels, Payne radioed for a rescue squad. Payne, McClarty, Strudl and Mead continued to pin Bear Heels to the ground as they waited for the rescue squad to arrive. During this wait, Sgt. Forehead arrived at the scene and assisted his officers by helping to secure the handcuffs and place flex cuffs on Bear Heels' legs. Filing 1 at 9. The rescue squad arrived within seven minutes from when Payne called for assistance. By the time Omaha Fire and Rescue handcuffed Bear Heels to a gurney and got him into the rescue unit, he had stopped breathing and had no pulse. Upon arrival at the hospital, Bear Heels still did not have a pulse and was not breathing. He was pronounced dead within fifteen minutes after arriving at the hospital. Filing 1 at 9.

### III. DISCUSSION

1. OFFICIAL CAPACITY CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

The individual defendants argue that because the City of Omaha is a named defendant, there is no need to sue the individual defendants in their official capacity. It is true that official capacity suits are "to be treated as a suit

---

[1] Each Taser discharge is a five-second cycle.

against the [governmental] entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The Court noted that "[t]here is no longer a need to bring official-capacity actions against local governmental officials, for . . . local government units can be sued directly for damages." *Graham*, 473 U.S. at 167 n.14. However, the individual defendants have not cited this Court to any authority holding that a plaintiff is barred from suing individual defendants in their official capacity when the governmental unit is also sued. *Graham* merely held that suits naming both a City and individual defendants in their official capacity were redundant, but that redundancy does not compel dismissal of the plaintiff's official capacity claims. Also, the Court notes that this is not the first time that the City of Omaha has had this same argument rejected. *See Higgins v. Dankiw*, No. 8:08-cv-15, 2008 WL 5282925, at *5 (D. Neb. Dec. 18, 2008).

2. S<small>GT</small>. E<small>RIK</small> F<small>OREHEAD</small> I<small>NDIVIDUAL</small> C<small>APACITY</small> C<small>LAIM</small>.

Forehead asserts that the plaintiff's Complaint failed to allege that he "engaged in any activity that would rise to the level of a § 1983 violation." Filing 17 at 4. The Court disagrees. The plaintiff alleged that Forehead knew there was no justification for detaining Bear Heels, but yet when he arrived at the scene, he saw his officers holding Bear Heels down against his will, and then assisted his officer with detaining Bear Heels by securing handcuffs and leg restraints. A jury could believe that Forehead participated in detaining Bear Heels without probable cause, and in the use of excessive force.

Moreover, before arriving on the scene and assisting with Bear Heels' restraint, Forehead twice advised Strudl and Mead that there was no basis to detain Bear Heels. It is unclear whether this Circuit recognizes a duty for law enforcement officers to intervene and stop constitutional violations outside of excessive force situations. In *Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir.

6

2012), the Court of Appeals held, "[a]ssuming law enforcement officers have a constitutional duty to intervene outside of the excessive force context, such duty was not clearly established in 2006." The defendants' encounter with Bear Heels was in 2017. If the *Livers*' court's assumption is correct, at least at this stage of the litigation there would be, in this Circuit, a clearly established duty to intervene and stop constitutional violations outside of excessive force situations.

Additionally, at this stage of the proceedings, a reasonable inference can be drawn from the allegations in the Complaint that Forehead was in contact with the officers at the scene while Bear Heels was being tasered, beaten, and otherwise physically restrained. There is a clearly established duty for law enforcement officers to intervene and stop the application of excessive force. *See Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981). The allegations in the Complaint indicate that Forehead did nothing to intervene and stop his officers' application of excessive force. The plaintiff has sufficiently stated a claim for relief against Forehead at this stage of the proceedings.

### 3. STRUDL AND MEAD EXCESSIVE FORCE CLAIMS.

Strudl and Mead assert that the only excessive force specifically attributed to them concerns their decision to handcuff Bear Heels for an extended period of time. They argue that because there is no allegation that the handcuffing caused a physical injury, their conduct does not rise to the level of an unconstitutional use of excessive force. Filing 17 at 4-5.

As to handcuffing alone, the Complaint alleges that the duration of the restraint exacerbated Bear Heels' psychotic state and violated Omaha Police Department policy, as well as national police standards, concerning the use of force in restraining a person experiencing a psychotic episode. But the defendants incorrectly assert that the only unlawful conduct attributed to

Strudl and Mead concerned handcuffing. There are allegations that Strudl and Mead failed to intervene when Bear Heels was being tasered and beaten, they acted together with Payne and McClarty to unlawfully restrain Bear Heels when he tried to get away, and they helped to drag Bear Heels back to Strudl's cruiser where Payne continued to discharge his Taser while Bear Heels was not resisting. The plaintiff alleges that the totality of Strudl and Mead's conduct, separately or together with the other individual defendants, caused Bear Heels' death and inflicted significant injury, pain and suffering prior to his death. The plaintiff has sufficiently stated a claim for relief against Strudl and Mead.

### 4. CLAIMS UNDER THE ADA.

The defendants contend that the plaintiff's failure-to-accommodate claims made pursuant to the Americans with Disabilities Act 42 U.S.C. 12132, must be dismissed because Bear Heels himself did not request an accommodation. In general, Title II of the ADA obligates police to protect a disabled person in the course of an arrest under two different theories: (1) the police wrongly arrest someone with a disability because they mistakenly perceive the effects of the disability as criminal conduct; or (2) police properly arrest a person with a disability but fail to reasonably accommodate such person's disability during the course of the arrest. *See Roberts v. City of Omaha,* 723 F.3d 966, 973 (8th Cir. 2013); *Gohier v. Enright,* 186 F.3d 1216, 1220-21 (10th Cir. 1999). But the ADA does not apply in exigent circumstances prior to the officer securing the scene and ensuring that any present danger has been abated. *Roberts,* 723 F.3d at 973.

The allegations in the plaintiff's Complaint do not fit neatly into either of the usual paradigms. The plaintiff alleged that Bear Heels was wrongly arrested, but not because the defendants misperceived his disability for

8

unlawful conduct. Instead, the allegations are that the defendants unlawfully seized Bear Heels because of his disability at a time when his conduct, although unusual, was lawful. Also, the plaintiff alleged that the need for a reasonable accommodation was apparent given that the defendants were aware of Bear Heels' mental disability, observed that he was psychotic, and failed to intervene in accordance with Omaha Police Department procedures or national police standards. The plaintiff also alleged that she requested a reasonable accommodation for her son when she asked the defendants to take Bear Heels into protective custody but that the defendants, knowing that Bear Heels was experiencing a psychotic episode, refused after speaking with Sgt. Forehead.

The sole argument advanced by the defendants is that they had no duty under the ADA to accommodate Bear Heels' disability because he did not request an accommodation. Filing 17 at 5-6. They point to the rule in the employment context that an employer's duty under the ADA is triggered by the employee's request for an accommodation. Filing 17 at 6; *e.g.*, *Sharbono v. N. States Power Co.*, 902 F.3d 891, 894 (8th Cir. 2018). But that argument fails for two reasons. First, one of the accommodations the plaintiff suggests—protective custody—was requested by the plaintiff. Filing 1 at 6, 18. A family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).

In addition, courts have held that a duty to accommodate a disability may be triggered where the disability and need to accommodate it are obvious—particularly when the disability itself interferes with the disabled person's ability to make a request. See *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197-98 (10th Cir. 2007); *Sacchetti v. Gallaudet Univ.*,

9

344 F. Supp. 3d 233, 272 (D.D.C. 2018); *Pierce v. D.C.,* 128 F. Supp. 3d 250, 283-84 (D.D.C. 2015); *see also Windham v. Harris Cty., Tx,* 875 F.3d 229, 236-37 (5th Cir. 2017). Also, the Eighth Circuit in *Roberts* engaged in an extended discussion of whether law enforcement had failed to accommodate the disability of a paranoid schizophrenic who had been shot during a psychotic episode, without intimating that the law required a paranoid schizophrenic to interrupt his psychotic episode to explain his disability and its requirements to law enforcement. 723 F.3d at 973.

It's "truly baffling as a matter of law and logic" to suggest that the protections of Title II of the ADA are unavailable to disabled persons whose need for accommodation is obvious to public officials, but whose disabilities prevent them from communicating a request for accommodation. *See Pierce,* 128 F. Supp. at 269-70; *accord Sacchetti,* 344 F. Supp. 3d at 272. In sum, Bear Heels' personal failure to request accommodation of his disability does not prevent the plaintiff from stating an ADA claim.

### 5. FAILURE TO GIVE MEDICAL AID.

The Due Process Clause of the Fourteenth Amendment required the defendants to provide necessary medical care to those who been taken into custody, such as Bear Heels. *City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244-45 (1983). To succeed on her claim, the plaintiff must show that the defendants were deliberately indifferent to Bear Heels' medical needs. *Walton v. Dawson,* 752 F.3d 1109, 1117 (8th Cir. 2014). Deliberate indifference as it pertains to individuals involves allegations of subjective knowledge—the individual defendants knew of and disregarded an excessive risk to Bear Heels' health and safety. The City's deliberate indifference standard is different. The City's standard "is purely objective: liability may be premised on obviousness or constructive notice." *Id.*

10

The individual defendants assert that there are no facts pled showing that when the encounter began, Bear Heels was suffering from an objectively serious medical need requiring the officers to obtain medical care. The individual defendants argue that Bear Heels "was not arrested" and that he did not "present any indication that he was a threat to himself or others." Filing 17 at 7-8. It is not possible to reconcile this argument with the facts pled in the Complaint—and at this stage of the proceedings the Court is required to "take all of the factual allegations in the complaint as true." *Twombly*, 550 U.S. at 555. The plaintiff alleged that the encounter with Bear Heels began when the police were summoned to a convenience store very late at night regarding a young man who would not leave. When the defendants arrived on the scene they observed Bear Heels dancing in the parking lot. Strudl and Mead contacted Bear Heels whose speech was described as garbled, and who they believed displayed signs of impairment. Strudl and Mead were concerned enough about Bear Heels that they handcuffed him behind his back and secured him in the back seat of Strudl's cruiser. They called Sgt. Forehead for advice on what to do and were told there was no basis to continue to detain Bear Heels. But they continued to detain Bear Heels in the back seat of a police cruiser with his hands still cuffed behind his back.

A reasonable inference from Strudl and Mead's unwillingness to release Bear Heels is that they were very aware that he was incapable of providing for his own basic needs or that he presented a danger to himself or others. Strudl spoke with the plaintiff and the plaintiff asked her to take Bear Heels to a crisis center until the plaintiff could get to Omaha to pick him up. When the plaintiff spoke with Bear Heels on the phone, Strudl and Mead observed that his speech was unintelligible. With those allegations taken as true, it would then have been even more apparent than before that Bear Heels required

11

protective custody due to a mental health condition. Strudl called Sgt. Forehead again to tell him that the plaintiff wanted her son taken to a crisis center. Forehead told his officers that there still was no basis to continue to detain Bear Heels. A jury could reasonably find that Strudl, Mead and Forehead were subjectively aware of Bear Heels' need for medical or mental health intervention due to obvious impairment but acted with deliberate indifference to his obvious needs by failing to take him into protective custody or to a mental health crisis center.

The plaintiff alleged that the City had at least constructive notice of Bear Heels' need for mental health intervention by his police contact the previous day where he was observed licking windows in the same area of Omaha. In addition, the plaintiff alleged that Sgt. Forehead was the relevant decision-maker for the City, and he actually knew Bear Heels was mentally impaired and needed medical intervention. Finally, the plaintiff alleged that the City's policies and procedures fail to train its officers on the rights and needs of mentally ill individuals that the City's police officers encounter on a daily basis. This training failure, if proved, demonstrates the City's deliberate indifference to the rights of the mentally impaired. The City did not respond to this allegation regarding its policies and procedures, and as such, there is no basis to dismiss the City at this stage of the proceeding.

Regarding the injuries that Bear Heels sustained that resulted in his death, the defendants contend that "the officers called for a medical squad as soon as it was apparent one was needed." Filing 17 at 9. Calling for an ambulance immediately upon observing the need for medical intervention does not demonstrate deliberate indifference to an arrestee's medical needs. *Tagstrom v. Enockson*, 857 F.2d 502, 503-04 (8th Cir. 1988). Neither does the

due process clause *require* law enforcement officers to give CPR or first aid to arrestees. *Id.*

The plaintiff's Complaint and brief, however, disputes when it was apparent that medical intervention was needed. The plaintiff argues that medical attention is advisable after a taser shock and that Taser International warns that repeated taser shocks can impair breathing and respiration. Filing 18 at 16. The plaintiff argues that police are typically trained in the use of cardio-pulmonary resuscitation and other advance life support measures for use in emergency situations. Although it may not be required, failing to use CPR in an emergency when the procedure could be safely and effectively employed could be viewed as showing the individual defendants' deliberate indifference to Bear Heels' medical needs. From the facts pled, there is at least a basis to believe that discovery is necessary to determine when it was apparent that Bear Heels required medical attention following the tasering, and whether at that time the individual defendants were deliberately indifferent to Bear Heels' need for medical attention. *See Twombly,* 550 U.S. at 545.

The defendants' brief did not present an argument concerning the City's role in failing to provide medical aid regarding Bear Heels' physical injuries. The plaintiff has sufficiently stated a claim for relief regarding the denial of medical care as to all defendants.

### 6. SOVEREIGN IMMUNITY.

There is no basis for the defendants' Rule 12(b)(1) motion. The plaintiff has not alleged any state law claims that would implicate the City's sovereign immunity.

IT IS ORDERED:

1. The defendants' motion to dismiss (filing 16) is denied.

2. This matter is referred to the Magistrate Judge for case progression.

Dated this 21st day of February 2019.

BY THE COURT:

_____
John M. Gerrard
Chief United States District Judge