**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **RENITA CHALEPAH, as personal representative of the estate of Zachary Nicholas Bear Heels for the benefit of the heirs and next of kin and as personal representative of the estate of Zachary Nicholas Bear Heels, deceased;**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**THE CITY OF OMAHA, NEBRASKA, a Nebraska Political Subdivision; et al,**<br><br>**Defendants.** | **8:18CV381**<br><br>**ORDER** |

This matter comes before the Court following the discovery dispute hearing held with counsel for the parties on April 16, 2020. In advance of the hearing, the parties emailed arguments and a discovery dispute chart to the undersigned magistrate judge, attached to this order. In accordance with the Court's rulings made during the hearing,

**IT IS ORDERED**:

1. The Court's ruling on the parties' discovery disputes is stated on the record uploaded to the docket, (Filing No. 88, audio recording).

2. On or before **May 8, 2020,** the individual defendants shall produce their tax records and supplement their production to the outstanding discovery requests as directed by the Court on the record.

Dated this 16th day of April, 2020.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

A party may object to a magistrate judge's order by filing an objection within fourteen (14) days after being served with a copy of the order. NECivR 72.2. Failure to timely object may constitute a waiver of any objection.

Moving Party: Plaintiff Renita Chalepah

Chalepah v. City of Omaha, et al., 8:18-cv-381

To assist the Court in more efficiently addressing the parties' discovery dispute(s), the parties shall meet and confer, and jointly complete the following chart. The purpose of this chart is to succinctly state each party's position and the last compromise offered when the parties met and conferred. The fully completed chart shall be e-mailed to chambers of the assigned magistrate judge.

The moving party is: Plaintiff

The responding party is: Defendant

**Note:** If discovery from both parties is at issue, provide a separate sheet for each moving party.

| Discovery Request at Issue | Relevant to prove... | Moving Party's Initial Position | Responding Party's Initial Position | Moving Party's Last Offered Compromise | Responding Party's Last Offered Compromise | Court's Ruling |
|---|---|---|---|---|---|---|
| **RFP #40** (Requested 10.31.19.) Seeking Financial documents of taser affiliated experts. | financial bias and potential interest in the outcome. | Unsure of documentation available, wanted City to inform. Offered to take with protective order. | 4. 10.20 email: will not provide unless required by Court. (See email attachment, Plaintiff 4.15.20 Correspondence to Court. | Protective Order & open to compromise when more info is provided. | | |
| Individual Defendant RFP Mead & McClarty, **RFP #4**, seeking tax returns. (Requested 1.08.20) | Punitive damages. | City has produced partial tax returns for the last 5 years from Strudl and Payne and complete tax returns from Forehead. Plaintiff wants specific production date. | Agreed to produce. | | | |

Moving Party: Plaintiff Renita Chalepah

| Discovery Request at Issue | Relevant to prove... | Moving Party's Initial Position | Responding Party's Initial Position | Moving Party's Last Offered Compromise | Responding Party's Last Offered Compromise | Court's Ruling |
|---|---|---|---|---|---|---|
| Request for correspondence/emails sent and received by individual defendants to other defendants or other OPD officers re: death or death investigation of ZBH. (Requested 1.08.20) | Demonstrates a possible change in testimony or an effort to tailor testimony & would be used to impeach. | (1) Defendants claim this is an unauthorized request per Judge Jan 3, 2020 order permitting Plaintiff to see additional RFPs from individual defendants. (2) Overly burdensome. | | Plaintiff limited the time frame for production to the following dates: June 5, 2017 through October 15, 2017, duration of death investigation; Oct.1, 2018 through Dec. 31, 2018, Payne jury trial. | | |
| Request for individual defendants cell phone billing records for all cell phones used by the individual officers at the time of ZBH death & during death investigation. (Requested 1.08.20) | During SGT. Tracy Scherer's (now LT) IA interview of Strudl & Mead, Strudl claimed Mead was texting her during Strudl's IA interview. There was also significant discussions between Payne and McClarty at the hospital in violation of OPD policy. This proves an effort to tailor or conform testimony to one story and would be used to impeach. | 1) Defendants claim this is an unauthorized request per Judge Jan 3, 2020 order permitting Plaintiff to see additional RFPs from individual defendants. (2) Overly burdensome. | | Plaintiff limited the time frame for production to the following dates: June 5, 2017 through October 15, 2017, duration of death investigation; Oct.1, 2018 through Dec. 31, 2018, Payne jury trial. | | |

Moving Party:   Plaintiff Renita Chalepah

| Discovery Request at Issue | Relevant to prove... | Moving Party's Initial Position | Responding Party's Initial Position | Moving Party's Last Offered Compromise | Responding Party's Last Offered Compromise | Court's Ruling |
|---|---|---|---|---|---|---|
| Request for individual defendants cell phone text messages exchanged, sent or received by defendants and any OPD officer or co-defendant. (Requested 1.08.20) | During SGT. Tracy Scherer's (now LT) IA interview of Strudl & Mead, Strudl claimed Mead was texting her during Strudl's IA interview. There was also significant discussions between Payne and McClarty at the hospital in violation of OPD policy. This proves an effort to tailor or conform testimony to one story and would be used to impeach. | 1) Defendants claim this is an unauthorized request per Judge Jan 3, 2020 order permitting Plaintiff to see additional RFPs from individual defendants. (2) Overly burdensome. | | Plaintiff limited the time frame for production to the following dates: June 5, 2017 through October 15, 2017, duration of death investigation; Oct.1, 2018 through Dec. 31, 2018, Payne jury trial. | | |
| Request for transcripts, reports and recommendations, & exhibits from the police arbitration hearing involving Strudl, Mead, Payne & McClarty. (Requested 10.31.19) | Provides previously sworn testimony of the four defendants and other relevant witnesses. | | Defendants agreed to produce redacted copies. | Plaintiff agreed to a Protective Order. Redaction is not an appropriate remedy for these documents. | | |

Moving Party: Plaintiff Renita Chalepah

| Discovery Request at Issue | Relevant to prove... | Moving Party's Initial Position | Responding Party's Initial Position | Moving Party's Last Offered Compromise | Responding Party's Last Offered Compromise | Court's Ruling |
|---|---|---|---|---|---|---|
| Request for the missing Taser barb. (Requested 1.08.19) | Evidence tampering. | Produce if Payne or McClarty is still in possession. (Paramedic Greg Winbinger told police that the "black officer with the tattoos took the barb from the floor of the Squad" on June 5, 2017. | | None. | | |
| Request for the CV's and reports from the experts called in Payne's criminal trial. Four experts: Kroll, John Peters, Steven Ijames and James Borden. (Requested 10.31.19) | Expert witness Information. | Production is required by Rule 26. Defendant originally spoke with Payne's counsel and agreed to produce. Defendant now claims she will not produce and that the info is not in Payne's possession. Plaintiff believes that these documents are in Payne's constructive possession since the requested materials are in his lawyer's possession and he can request copies. | | None. | | |

Moving Party: Plaintiff Renita Chalepah

| Discovery Request at Issue | Relevant to prove... | Moving Party's Initial Position | Responding Party's Initial Position | Moving Party's Last Offered Compromise | Responding Party's Last Offered Compromise | Court's Ruling |
|---|---|---|---|---|---|---|
| Request for all polygraph reports connected to the death of ZBH involving any of the 5 named individual defendants. (Requested 10.31.19) | Relevant statement by named defendant. Defendants have produced a polygraph report involving a polygraph taken by Erik Forehead but it is incomplete. Plaintiffs want a copy of the complete report. | Production is required. | | None. | | |

Counsel for [Plaintiff]: Isaacs, Maddox & White

Counsel for [Defendant]: Peters & Wiesen

Date: April 15, 2020825

LAW OFFICES OF
GARVIN A. ISAACS, INC.
1400 N. SHARTEL AVENUE
OKLAHOMA CITY, OKLAHOMA 73103
TELEPHONE (405) 232-2060
FAX (405) 232-9035

GARVIN A. ISAACS
ALSO MEMBER STATE BAR OF NEW MEXICO

DEBBIE MADDOX

14 April 2020

Magistrate Judge Michael Nelson
Roman L. Hruska Federal Courthouse
111 South 18th Plaza
Omaha, Nebraska 68102

RE: Chalepah v. City of Omaha et al., 8:18-cv-381.

Dear Judge Nelson:

The issues for tomorrow's phone conference regarding outstanding discovery matters follow:

1) There is a dispute as to Plaintiff's RFP #40: This RFP requested "*all materials that document a professional relationship between all designated experts and Axon/Taser International, whether the connection is through current or former employment, research, publication of articles, financial payments, stock ownership, position on advisory boards, expert witness, or training officers, in an electronic format. This request includes the production of tax records which document any type of financial payments or stock ownership.*"

The parties conferred about this request on April 1, 2020, and the Defendant took the request under advisement and on April 10, 2020, Defendant explained that "RFP 40 seeks information beyond the expert report and disclosures of Rule 26 and Defendants will not provide such information unless specifically required by the court."

Two of Defendants' experts, Mark Kroll and Dr. William Bozeman, have ties to Axon/Taser. Kroll is a director on Axon's corporate board since 2003, a current employee and stockholder. Kroll is also the current Chair of the Axon Litigation

Committee and the Axon Scientific and Medical Committee. He has published numerous articles in that capacity and all of the articles advocate that Taser is a safe weapon and does not cause death.

Plaintiff submits that these connections to the corporate governance of Taser/Axon Enterprises give Kroll an interest in the outcome of this case. As a corporate director Kroll owes a fiduciary duty to the shareholders and, as such, it is questionable whether Kroll can be neutral and address all relevant issues regarding the safety of the taser. To publicly address how an electronic control device can lead to the death of a person who was subjected to 12 taser strikes in court litigation may well be prohibited by his employer and could effect the value of the stock. In addition, Kroll's financial connections to Taser entitle Plaintiff to explore his bias at trial and potentially during motion practice.

Similar issues of financial bias arose in a Maryland case, *Behler v. Hanlon,* 199 F.R.D. 553 (D. Md. 2001) where the fact that an expert witness had a 20-year history of earning significant income testifying primarily as a witness for defendants and an ongoing economic relationship with certain insurance companies was deemed relevant by the trial court. The Court found that the financial relationship certainly fit within recognized examples of bias/prejudice impeachment, making such facts relevant to the subject matter of the litigation and placing it squarely within the scope of discovery recognized by the courts.

Plaintiff is seeking the financial information of Taser affiliated experts because of the risk that their opinions are financially motivated. The requested information sought by Plaintiff from the defense experts is relevant to bias/prejudice impeachment, and therefore, it is within the scope of discovery permitted by Rule 26(b)(1). *See Also: U.S. v. Abel*, 469 U.S. 45 (1984).

Disclosing a witness's self-interest is a proper purpose of attacking a witness's credibility. As it relates to a witness's financial stake in the outcome of litigation, a party is entitled to present evidence to demonstrate that "a witness might be more likely to testify favorably on behalf of the defendants because of the witness's financial incentive to continue the financially advantageous relationship." *Allstate Ins. Co v. Boecher,* 733 So. 2d 993, 997-998 (Fla. 1999). Pre-trial discovery was implemented to aid and protect all parties "to achieve a balanced search for the truth to ensure a fair trial." *Elkins v. Syken,* 672 So. 2d 517, 522 (Fla. 1996).

Many courts have agreed that an expert's financial gain from testifying in a particular type of case, or on behalf of a specific law firm or party, is relevant to credibility and is appropriate subject matter for impeachment. *See e.g. Behler, at 561; Fox v. General Motors LLC,* No. 1:17-CV-209-MHC, 2019 WL 3503754, at *2

(N.D. Ga. Jan., 18, 2019*); Allstate Ins. Co. V. Electrolux Home Prod., Inc.,* No. 16-CV-4161, 2017 WL 5478297, at*5 (N.D. Ill. Nov. 15, 2017).

(2) Plaintiff has requested all of the individual defendants' tax returns for the last five years. Defendant has provided complete tax returns for Forehead, partial tax returns for Payne and Strudl and we are still awaiting the returns for Mead and McClarty. Plaintiff is seeking a deadline for production. The request was made on January 9, 2020.

(3) Plaintiff has requested *"correspondence and emails sent and received by you (names individual defendants) and any OPD officer or any of the other individual defendants named in the lawsuit, regarding the death or death investigation of Zachary Bear Heels, in an electronic format*." This request was directed to all five named individual defendants. During the parties' April 1, 2020, phone conference, the Plaintiff provided a specific time frame for the production in an effort to make the request less burdensome. Plaintiff requested the records between the dates of June 5, 2017 through October 15, 2017 and also, October 1, 2018 through December 31, 2018. (Plaintiff made a similar request to the City of Omaha in RFP #17.)

Defendants object to this production claiming that when this Court authorized Plaintiff to serve individual RFPs during the January 3, 2020, telephone hearing, the Court ordered that Plaintiff's requests must be identical to the RFPs previously served on the City of Omaha. Plaintiff could not identify that limitation when reviewing the audio transcript. Defendants have posed the same objection to the Plaintiff production requests described below in Item #4 and Item #5.

(4) Plaintiff has requested the cell phone billing records for all cell phones used by the individual officers at the time of Bear Heels' death and during his investigation, in an electronic format. Plaintiff added the same time frame described above for production purposes.

(5) Plaintiff has requested the cell phone text messages exchanged, sent or received by you (the individual defendants) and any OPD officer or any of the other individual defendants named in this lawsuit. This request specifically includes information exchanged regarding the missing taser barb. Plaintiff added the same time frame described above for production purposes.

(6) Plaintiff has requested the transcripts, reports and recommendations and exhibits from the police arbitration involving Defendants Strudl, Mead, Payne and McClarty which was conducted in November of 2019.

Defendants have offered these materials with redaction of the names of the

arbitrators and comparators. Plaintiff objects to this limitation but agrees to receive the materials pursuant to the Agreed Protective Order forwarded to the Court yesterday. Plaintiff does not intend to waive the right to call any of the comparators or arbitrators but Plaintiff does agree to hold the records pursuant to the Order. The arbitration proceedings involve a matter of public interest and public safety and there are no sufficient grounds to redact the contents.

(7)    Plaintiff has requested production of the missing taser barb. The City of Omaha stands by its previous objections. Plaintiff requests that the lawyers ask both Payne and McClarty if they are in possession of the barb and produce it if they do have it. Plaintiff would agree to collection by law enforcement officers as well.

(8)    Plaintiff has requested the CV's and reports of the experts called by Defendant Payne during his criminal trial. He called four experts, Mark Kroll, John Peters, Steven Ijames and James Borden. Counsel for the Defendants states that Payne is not in possession of those documents but that his lawyer has that information. Plaintiff submits that this is constructive possession and that Defendant Payne should be ordered to get that information from his counsel for purposes of production.

(9)    Plaintiff received a partial polygraph report involving Defendant Forehead from the Defendants in November of 2019. The polygraph involved a matter related to the instant case. The polygraph report refers to the graphs collected during the testing but does not include that information. Plaintiff seeks production of the complete polygraph report.

This correspondence represents all of the discovery matters discussed with the Defendants on April 1, 2020, during a phone conference. Defendants formally responded to the discovery requests in an email sent to Plaintiffs on April 10, 2020. *See Attached Email Exchanged Between the Parties Regarding Outstanding Discovery.*

Sincerely,


Debbie Maddox

 Garvin Isaacs <apacheoklahoma@gmail.com>

# April 1, 2020 Discovery Conference

2 messages

**Garvin Isaacs** <apacheoklahoma@gmail.com> Wed, Apr 1, 2020 at 5:04 PM
To: "apacheoklahoma@gmail.com" <apacheoklahoma@gmail.com>, Debbie Maddox <dlynnemaddox@aol.com>, Tom White <twhite@whitejorgensen.com>, Mary Jo Gunnels <mgunnels@whitejorgensen.com>, "Ryan J. Wiesen (Law)" <Ryan.Wiesen@cityofomaha.org>, "Michelle Peters (Law)" <michelle.peters@cityofomaha.org>

All:

Here is my summary of the discussions from our discovery conference that we conducted today at 1:30 pm. Feel free to offer any corrections to this email in case I explain something in a careless way.

Discussion started with Plaintiff's **RFP # 40.** #40 requested *all materials that document a professional relationship between all designated experts and Axon/Taser International, whether the connection is through current or former employment, research, publication of articles, financial payments, stock ownership, position on advisory boards, expert witness, or training officers, in an electronic format. This request includes the production of tax records which document any type of financial payments or stock ownership.*

Plaintiff is aware that Mark **Kroll** has received a salary from Taser in the past, that he is a shareholder, that he sits on the corporate Board of Directors, that he previously sat on the medical advisory board, and that he is now in charge of Litigation Services. Kroll has also published more than 50 articles in favor of the Taser.

**Bozeman** has also been a co-author in numerous publications dismissing any and all possible problems resulting from the use or misuse of the Taser X26 and X26P.

We expect there are tax documents, along with other internal documents, that confirm these professional association/relationships and that is the information Plaintiff is seeking. The parties agreed that this info can be produced along with the other expert disclosures from Defendants which is due on June 19, 2020. (4th Am. P. O.)

**Individual Defendant RFPs, Mead & Strudl:** Their RFPs are identical except in name. The RFPs at issue are # 4, 8, 9, 10, 11 & 12 are at issue.

**#4** concerns production of tax returns. Michelle stated that she has instructed all of the individual defendants to produce their tax returns and she will check on the progress of that production.

**#8** requests correspondence and emails *sent or received by you and any OPD officer or any of the other individual defendants named in the lawsuit, regarding the death or death investigation of Zachary Bear Heels in an electronic format.* RFP #8 is connected to Plaintiff's prior RFP #17.

**RFP #9** requests the cell phone billing records for the cell phone used by the officer at the time of Bear Heels' death and during his death investigation, in an electronic format. RFP #9 is connected to Plaintiff's prior RFP #12 and #43.

**RFP #10**: Requests production of cell phone text messages exchanged, sent or received by you and any OPD officer or any of the other individual defendants named in this lawsuit. Request specifically includes info exchanged regarding the missing taser barb. RFP #10 is connected to Plaintiff's prior RFP #12 and #43.

The Plaintiff proposed a specific **range of dates** for purposes of production regarding the correspondence/email and cell phone information that would apply to all 5 individual defendants. Plaintiff's request for records described in RFPs 8, 9 and 10 would begin June 5, 2017 through October 15, 2017 and also, October 1, 2018 through December 31, 2018.

The parties also discussed **RFPs #11 and #12**. These RFPs request production of the arbitration report and recommendation, transcripts and exhibits. Michelle explained that she believes the 3 arbitrators intend to keep all of these materials confidential or privileged? Ultimately, there is currently an "order" to seal the records although Plaintiff asserted that this claim is a dubious claim. To withhold records there must be a statutory exception based upon privacy, confidentiality or privilege. The parties also discussed the option of serving a subpoena for the materials. Michelle informed us that the final arbitration report due date has been extended to May 1 and she will inform Plaintiff when the order comes out. Michelle also agreed to share the names and addresses of the arbitrators/official keeper of the record name and address so that Plaintiff could issue a SDT for the materials.

**Defendant McClarty:** RFP #4, 8, 9, 10, 11, 12 & 14 are at issue:
#4 concerns tax returns.
#8, 9 and 10 are the same 8, 9 and 10 found in Mead & Strudl.
#11 and 12 involve the arbitration materials.
#14 is a request for the missing taser barb.

**Defendant Payne:** RFPs # 6, 7, 11, 12, 13, 14, 15, 16 and 18 are at issue.
**#6 and #7**: These are the requests for all of the expert reports, CVs, publications and invoices for the experts Payne used in his criminal trial. There were 4 experts witnesses called by Payne: Kroll, Ijames, Peters and Borden and Plaintiff is seeking this info from all 4 experts.
**#11**: requests documents provided to the experts in the Payne criminal trial. (See Plaintiff's RFPs #44 & #45 sent to the City of Omaha).

**#12, 13 and 14**: (These three requests are 8, 9 and 10 in Mead, Strudl and McClarty RFPs). Requests for correspondence, emails, cell phone billing records and text messages.

**#15 and 16**: Requests for Arbitration report and recommendations, transcripts and exhibits. (These RFPs are connected to Plaintiff's
**RFPs 21 and 22** sent to the City of Omaha.)
**RFP #18**: request for the missing barb.

**Defendant Forehead**: RFPs #4, 8, 9, 10 and 11 are at issue.
**#4** requests tax returns.
**#8, 9 and 10**: Requests correspondence and emails, cell phone billing and text messages. (Connected to Plaintiff RFPs #12 and 43.)
**#11**: Complete production of the polygraph report along with the testing graphs.

The 4th Amended Progression Order provides a discovery cut-off of April 3 and Plaintiff's Motion to Compel is due on April 17. So by next Friday, Plaintiff will likely be requesting a telephone conference with the judge to discuss the discovery issues.

Please let me know if you have any questions in your effort to get production. I am working at home and at the office so I will be checking my email at dlynnemaddox@aol.com throughout the day.

Stay well!
Debbie

Garvin A. Isaacs, Inc.
1400 N. Shartel Avenue
Oklahoma City, Oklahoma 73103
tel: 405-232-2060
fax: 405-232-9035
apacheoklahoma@gmail.com

This message is intended only for the addressed recipient. This message is confidential. It may also be privileged or otherwise protected by work product or other applicable privileges. If you have received it by mistake, please let me know by e-mail reply and delete it from your system. Thank you.

---

**Michelle Peters (Law)** <Michelle.Peters@cityofomaha.org> Fri, Apr 10, 2020 at 12:10 PM
To: Debbie Maddox <dlynnemaddox@aol.com>, Garvin Isaacs <apacheoklahoma@gmail.com>, Tom White <twhite@whitejorgensen.com>, Mary Jo Gunnels <mgunnels@whitejorgensen.com>
Cc: "Ryan J. Wiesen (Law)" <Ryan.Wiesen@cityofomaha.org>

Debbie and all:
Ryan and I have considered your arguments and respond as follows:

1) RFP #40-- You have asked for "all materials that document a professional relationship between all designated experts and AXON/TASER International, whether the connection is through current or former employment, research, publication of articles, financial payments, stock ownership, position on advisory boards expert witnesses, or training officers, in an

electronic format. This request includes the production of tax records which document any type of financial payments or stock ownership." Defendants have objected to this request and will continue to object.

Expert witness discovery is defined by F.R.Civ.P. 26(a)(2) and (b)(4). As discussed by Magistrate Zwart, from the District of Nebraska in *Morriss v. BNSF Ry Co.,* 2014 WL 128393 *6, No. 8:13cv24 (1/13/14), "[t]he expert disclosure and discovery limitations of Rule 26 represent a reasoned balance between sufficient expert disclosures and unfettered expert discovery as expressed in case law and the document discussions of the Rules Committee. As referenced repeatedly in the advisory notes to rule 26, the provisions of the rules were adopted to limit the undue burden and cost of expert discovery."

RFP #40 seeks information beyond the expert report and disclosures of Rule 26 and Defendants will not provide such information unless specifically required by the Court.

2) Production of tax returns. I believe we have provided Mead's and Forehead's tax returns-- those are the two most recent disclosures. We are still waiting on Strudl and McClarty. Another request has been made.

3) With regard to the request of all individual defendants that they "Produce all electronic mail sent and/or received by you and OPD officer or any other individual defendants named in this lawsuit after June 4, 2017...."

Defendants stand by their objections to this request. Your allegation that this request is related to previous RFP #17 is not well taken. RFP #17 requests "Produce all hard-copy and email correspondence sent to the Omaha Police Department/ City of Omaha by TASER..."

These requests are only "related" insofar as they both ask for emails.

4) Similarly, you have requested of all individual defendants that they "Provide cell phone billing records after June 4, 2017, that include but is not limited to, the phone number, billing address, account number, call logs and name of the service provider that you were using while employed as a police officer...."

Again, Defendants stand by their objections to this request. You indicate these requests are related to previously sent RFP #12 and #43. No. 12 asks for "all text messages received from Brogan Cordova specifically. This request also includes all other text messages collected during the course of the In-Custody Death investigation for the specific purpose of the Bear Heel's death investigation."

#43 requests that the City "Produce all phone records collected by OPD during the course of the OII Investigation of Zachary Bear Heels in an electronic format."

These requests again are only related insofar as phone records are requested. Your requests to the individual defendants go far beyond the original requests. The court clearly stated it was not going to let you expand your discovery to things not previously requested of the City defendant.

5) Arbitration transcript and exhibits. So we have made headway here, I hope. The arbitrators do not want to be disclosed or contacted. So, if this is agreeable, Ms. Quinn will provide you with a copy of the transcript and exhibits with the arbitrators' names/id s redacted. Mr. Dowd also asked that names of certain "comparators" (not witnesses) be redacted due to confidentiality matters. These were other employees identified during the arbitration as persons not receiving such harsh punishment. This is also predicated on a protective Order being issued. I know we have discussed in the past, but has one ever been issued?

6) With regard to the TASER barb, the City stands by its previous objections.

7) With regard to the expert CVs of the experts used in the criminal matter, neither the City nor Mr. Payne is in possession of those documents. His criminal attorney, Steve Lefler had those. I have requested them from him 2x, but I have not received them. I believe they were likely offered at the criminal matter and you have had access to all of those documents. Mr. Lefler indicated there were no "reports" because those were not required to be produced through criminal procedure.

8) Forehead polygraph report /"actual graph" is allegedly missing. We have requested IA look into this and are still awaiting a response.

I plan on being in the office next week, if we need to discuss any matters. Have a safe/blessed weekend.

*Michelle Peters*
Deputy City Attorney
(402)444-5128
michelle.peters@cityofomaha.org

The information contained in this email contains confidential information from the Omaha City Attorney's Office that is intended solely for the recipient set forth above. Any redistribution, copying or other dissemination of the contents of this transmission is prohibited. Please be advised that the contents of this email may be intercepted or diverted through transmission over the internet and therefore the security of this email cannot be guaranteed by the sender.

[Quoted text hidden]

additional authority regarding the production of experts financial info. @ p.5

Search Terms: Select term(s) to navigate ▼ Clear highlights

**825 F.3d 876**

**Jesse Ventura, also known as James G. Janos, Plaintiff–Appellee**
**v.**
**Taya Kyle, as Executor of the Estate of Chris Kyle, Defendant–Appellant.**

**33 Media Companies and Organizations; The First Amendment Scholars; Thomas More Law Center, Amici on Behalf of Appellant.**

**No. 14–3876**

**United States Court of Appeals, Eighth Circuit.**

**Submitted: October 20, 2015**
**Filed: June 13, 2016**
**Rehearing and Rehearing En Banc Denied Aug. 2, 2016.**

Lee Levine, Washington, DC, argued, John Philip Borger, Charles F. Webber, Mary A. Walker, of Minneapolis, MN, on brief, for appellant.

David Bradley Olsen, argued, David Bradley Olsen, Court J. Anderson, John Norbert Bisanz, Jr., Benjamin J. Hamborg, Minneapolis, MN, on brief, for appelle.

Floyd Abrams, New York, NY, Leonard M. Niehoff, Erin Elizabeth Mersino, Richard Thompson, Ann Arbor, MI, Paul Mathew Mersino, Detroit, MI, Susan Buckley, Merriam Mikhail, New York, NY, amicus on behalf of appellant.

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

RILEY, Chief Judge.

Before his death, Chris Kyle was a sniper for a United States Navy Sea, Air and Land (SEAL) team.[1] He authored the book American Sniper: The Autobiography of the Most Lethal Sniper in U.S. Military History (American Sniper ). In the book, Kyle described punching a "celebrity" referred to as "Scruff Face" who was making offensive remarks about the SEALs at a gathering following the funeral of a SEAL killed in combat. In interviews about the book, Kyle revealed "Scruff Face" was James Janos, better known as Jesse Ventura. Ventura, who was at the bar but denied a fight occurred, sued Kyle in this diversity action[2] under Minnesota law for defamation, misappropriation, and unjust enrichment, alleging Kyle fabricated the incident. The jury found in favor of Ventura on the defamation claim, awarding $500,000 in damages, and found in Kyle's favor on the misappropriation claim. Serving in its advisory role as to the equitable unjust-enrichment claim, the jury recommended an award of approximately $1.35 million, which the district court adopted. Kyle appeals the district court's denial of his motion for judgment as a matter of law or a new trial. Having jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand, in part.

## I. BACKGROUND

The alleged altercation underlying this action occurred at McP's, a bar in Coronado, California, where Kyle and some friends were gathered in October 2006 after the funeral of a fellow SEAL. According to Kyle,

> Scruff started running his mouth about the war and everything and anything he could connect to it. President Bush was an asshole. We were only over there [Iraq] because Bush wanted to show up

[825 F.3d 879]

> his father. We were doing the wrong thing, killing men and women and children and murdering....
>
> Scruff said he hates America.

Kyle approached Scruff and asked him to "cool it." "You deserve to lose a few," Scruff replied. Kyle was "calm," but Scruff swung at him. Kyle "laid him out. Tables flew. Stuff happened. Scruff Face ended up on the floor. [Kyle] left."

On January 4, 2012, the day after his book was released, Kyle was interviewed on a radio program and the television program "The O'Reilly Factor" to promote the book. During the radio interview, one of the hosts said there was a caller on the line who was saying Kyle was "in a bar fight with Jesse [Ventura]," a political commentator who formerly served as the Governor of Minnesota and in the Navy special forces. When asked if this was true, Kyle confirmed it was. During the television interview later that day, host Bill O'Reilly asked Kyle, "[Y]ou say you knocked Jesse Ventura to the floor with a punch. Now, you don't mention his name, but everybody knows who that is.... [T]hat happened?" Kyle again confirmed he "knocked him down." In the interviews, Kyle described the events similarly to the way he did in the book, adding that after he punched Ventura, "I took off running, because the cops were already outside.... [C]ops were watching, they saw the whole thing happen."

Kyle's editor described the publicity resulting from Kyle's radio interview as "priceless" in an email, and Kyle's publicist agreed the publicity response was "HOT, hot, hot!" The book was by all accounts a success. In 2014, Kyle's editor testified 1.5 million copies had been sold.

After the interviews, Ventura sued Kyle for defamation, misappropriation, and unjust enrichment on the grounds that Kyle fabricated the entire interaction with Ventura. Kyle moved for summary judgment on Ventura's claims of misappropriation and unjust enrichment, emphasizing he had "provided the Court with case after case, all rejecting these types of ... claims in the context of expressive works." The district court denied the motion.

At the close of discovery, Kyle moved for summary judgment on all claims. The district court concluded Kyle was not entitled to summary judgment on Ventura's defamation claim because "Ventura has proffered sufficient evidence upon which a jury could conclude that Kyle's statements [in the book] were materially false." The district court noted there were conflicting eyewitness accounts of the alleged incident, and photos of Ventura from the following day showed no visible injuries. The district court also rejected Kyle's rehearsed motion as to the misappropriation and unjust-enrichment claims.

The case was tried in summer 2014, almost eight years after the alleged altercation. Ventura testified he had a normal evening without any verbal or physical altercation. Three people who were with him that evening also testified they witnessed no altercation. However, these people were not in Ventura's immediate vicinity for the entire evening, and one testified he was hard of hearing.

Ventura also introduced evidence Kyle told different versions of the story. For example, in the book, Kyle alleged Ventura took the first swing, but he did not mention that in his interviews. Kyle mentioned in the interviews, but not the book, that the police saw the

whole incident. Ventura produced a letter from the Coronado police department stating there was no police record mentioning Ventura's or Kyle's name. Ventura introduced photos of himself at a graduation event the day after the alleged incident that show no obvious injuries, despite Kyle having written "rumor

[825 F.3d 880]

has it he showed up at the BUD/S graduation with a black eye."

The jury watched part of Kyle's video-recorded deposition recounting his version of the evening's events. Kyle also presented several witnesses who were at the bar that evening, who testified they either heard Ventura make the alleged comments, witnessed some type of physical altercation, or both. All of Kyle's witnesses were current or former SEALs or friends or family of SEALs.

At least seven witnesses testified they overheard some of Ventura's remarks, and offered generally similar accounts of what Ventura said. At least seven witnesses testified they saw Kyle (or an unidentified man, for those who did not know Kyle) punch Ventura; saw Ventura on the ground or getting up off the ground; or heard a "commotion" or "yelling." Witness estimates of the timing and location of the incident were not consistent.

When questioned on cross-examination, Ventura agreed he had previously made controversial comments such as, "More and more we're seeing an Army run by Christianist extremists and an accompanying cadre of what can only be described as neo-Nazis."

Two witnesses from HarperCollins, American Sniper 's publisher, also testified at trial. Sharyn Rosenblum, HarperCollins's publicist for Kyle's book, testified about the general process of preparing the book for publication and said she did not know who "Scruff Face" was when she read the manuscript of the book, and did not ask. She testified she did not see the "Scruff Face" subchapter as relevant to her publicity campaign for the book but she wanted to focus on "the themes of the war, military service, love of country, [and] the patriotism to serve one's country." She was "surprise[d]" when Ventura's name came up in Kyle's interview. When asked whether "the Ventura story ha[d] any impact on the success of the book," Rosenblum replied it was "a very insignificant part" and did not impact the book's success. Kyle's editor, Peter Hubbard, testified the "Scruff Face" story was not relevant to his decision to enter into a book contract with Kyle. Hubbard indicated he never suggested incorporating that subchapter into HarperCollins's marketing campaign for the book. He characterized the "mention of Jesse Ventura" as having a "negligible" effect on the success of the book.

Ventura's counsel sought to impeach the HarperCollins witnesses by questioning them about Kyle's and HarperCollins's insurance coverage to show HarperCollins had "a direct financial interest in the outcome of th[e] litigation" and the witnesses were biased in favor of Kyle. See Fed. R. Evid. 411 (permitting questioning about insurance coverage to show a witness's bias). Kyle's counsel objected to this testimony prior to its introduction, but the district court allowed it. See Fed. R. Evid. 403 (providing that otherwise admissible evidence may be excluded "if its probative value is substantially outweighed by a danger of ... unfair prejudice").

Ventura's counsel asked Rosenblum, "[A]re you aware that the legal fees for the estate's attorneys ... are being paid by the insurance company for HarperCollins?" and "Are you aware that HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance?" Rosenblum denied knowledge of HarperCollins's insurance policy. Ventura's counsel asked Hubbard if he knew about any insurance

provisions in Kyle's contract with HarperCollins. He said he did not. Kyle's counsel moved for a mistrial after both inquiries. The district court denied both motions.

Then, during closing arguments, Ventura's counsel opined:

[825 F.3d 881]

> Sharyn Rosenblum testified that she did not know her company's *insurer is on the hook if you find that Jesse Ventura was defamed* . Both her and Peter Hubbard also testified that they do not know that their company's insurer was paying for the defense of this lawsuit. But they are not the disinterested, unbiased witnesses they were put in front of you for you to believe. It's hard to believe that they didn't know about the insurance policy because it's right in Kyle's publishing contract. Paragraph 6.B.3. of Exhibit 82, *Chris Kyle is an additional insured for defamation* under the publisher's insurance policy.

Kyle's counsel did not object in front of the jury, but moved again for a mistrial due to the insurance references once the jury was excused. The district court again denied the motion. Kyle's counsel did not ask for a curative instruction and the district court did not give one.

The jury struggled to reach a verdict. At noon on the fourth full day of deliberations, the jury reported they could not reach a unanimous decision. The district court instructed the jury to continue deliberating, yet they could not reach a verdict that day. The next morning the parties consented to permitting a 9–1 decision, but to no avail. The jury ultimately reached an 8–2 verdict on the fifth full day of deliberations. The jury found for Ventura on the defamation claim, made an advisory recommendation in Ventura's favor on the unjust-enrichment claim, and found for Kyle on the misappropriation claim. The jury awarded damages of $500,000 for defamation and recommended damages of approximately $1.35 million for unjust enrichment. The district court adopted the jury's recommendations as to the unjust-enrichment claim and accompanying damages award.

Among other assigned errors we need not reach, Kyle moved for judgment as a matter of law or a new trial, contending the jury was incorrectly instructed about the falsity element of defamation, the actual-malice requirement applicable in public figure defamation cases, and the applicable burdens of proof.[3] Kyle argued the unjust-enrichment judgment violated Minnesota law and the First Amendment and Ventura did not prove the amount he was enriched. Finally, he sought a new trial on the grounds that the jury's "awards were tainted by the admission of prejudicial testimony and argument regarding [Kyle's] insurance." The district court denied Kyle's motion. Kyle appeals.

We vacate the defamation judgment and damages award and remand that claim for

[825 F.3d 882]

a new trial. We further reverse the unjust-enrichment judgment, and vacate the accompanying damages award.[4]

## II. DISCUSSION

### A. Defamation Claim

The district court may grant a new trial on all or some issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or ... after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R. Civ. P. 59(a)(1)(A), (B). We review the district court's denial of a new trial "for a 'clear abuse of discretion.' " Behlmann v. Century

Sur. Co. , 794 F.3d 960, 963 (8th Cir. 2015) (quoting Burris v. Gulf Underwriters Ins. Co. , 787 F.3d 875, 878 (8th Cir. 2015) ). Kyle argues he is entitled to a new trial because the district court clearly abused its discretion by permitting Ventura to ask questions that put prejudicial information before the jury and to invoke Kyle's insurance in closing argument.

Initially, we reject Ventura's assertion Kyle waived any objection to the insurance testimony and argument because he did not object to the admission of his publishing agreement, which states, "Author will be named as an additional insured under the terms of any insurance policy that Publisher *may* carry which covers the cost of claims." (Emphasis added). In the event the jury analyzed the lengthy publishing contract's fine print and learned Kyle *may* have had insurance, this evidence alone would not permit Ventura's counsel to argue to the jury that an insurance policy including Kyle actually existed and the "insurer is on the hook." *See, e.g.* , City of Cleveland v. Peter Kiewit Sons' Co. , 624 F.2d 749, 758 (6th Cir. 1980) ("[W]hile mention of the contractually-mandated insurance may have been inevitable, it was prejudicial error for counsel for the City to inject into the trial the idea that Kiewit had insurance which would cover any damages the defendant would be obliged to pay."). Counsel's argument would have been improper and prejudicial, even if the jury already was aware of an insurance policy. See id. The record presented to this jury contained no evidence establishing an insurance policy covering Kyle, which makes Ventura's counsel's argument more improper and prejudicial.

We next consider the insurance testimony elicited from the HarperCollins employees. At trial, Ventura's counsel asked Rosenblum whether she was aware Kyle's attorneys were "being paid by the insurance company for HarperCollins" and "HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance." Ventura's counsel asked Hubbard whether he was "aware of any insurance provision in [HarperCollins's] contract [with Kyle]" and inquired "you obtain insurance coverage in the case when an author may get sued for libel or defamation, correct?" These questions assumed facts never in evidence—an insurance policy purchased by HarperCollins that covered Kyle, and Kyle's attorneys were paid by the insurer. Both witnesses denied awareness of any insurance policy. Kyle's counsel objected to this questioning before Ventura's counsel's cross-examination, tried to object at the time, and moved for a mistrial after each witness testified. The district court permitted this cross-examination, by which Ventura's counsel ostensibly sought to show the HarperCollins witnesses were biased in favor of Kyle because HarperCollins and Kyle were covered by the same insurance policy.

[825 F.3d 883]

Rule 411 of the Federal Rules of Evidence prohibits the introduction of insurance evidence to prove whether a person acted wrongfully but permits it for other purposes, such as proving a witness's bias. For example, we have permitted the use of evidence of insurance to show bias where a defense witness was employed by the defendant's insurance company. See, e.g. , Charter v. Chleborad , 551 F.2d 246, 248 (8th Cir. 1977) (per curiam); *see also* 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5367 (1st ed. 1980) ("The paradigm case for use of evidence of insurance to show bias is in the cross-examination of a claims adjuster or insurance company doctor.").

Other "economic tie[s]" may "influence the witness to favor the insurance company," including "ownership of stock in the company, or a promise of employment, or a promise to pay the witness directly for his testimony." Wright & Graham, supra § 5367 (footnotes omitted).

> A majority of jurisdictions addressing this issue have applied a "substantial connection" analysis in order to balance the probative value and potential prejudice.... The substantial connection analysis looks to whether a witness has

"a sufficient degree of connection with the liability insurance carrier to justify allowing proof of this relationship as a means of attacking the credibility of the witness." These courts have rejected a mere "commonality of insurance" approach, holding that the likelihood of bias is so attenuated that the risk of prejudice substantially outweighs the probative value.

Bonser v. Shainholtz , 3 P.3d 422, 425 (Colo. 2000) (quoting Otwell v. Bryant , 497 So.2d 111, 114 (Ala. 1986) ) (finding a "substantial connection" between an expert witness and the defendant's insurance company where the defendant and the expert witness were both members of a small insurance trust for dentists, "the expert witness had cofounded the trust," payments of claims "could result in a rise in premiums charged to all members," and "all members would be required to absorb a share" of any judgment exceeding the amount in the trust); cf. Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice.").

Here, there is no evidence Rosenblum and Hubbard had any economic tie or "substantial connection" to HarperCollins's insurance carrier. They were not currently or formerly employed by the insurance company, seeking employment with the insurance company, paid for their testimony by the insurance company, or holders of stock in the insurance company. See Wright & Graham, supra § 5367. There was no risk Rosenblum and Hubbard might personally contribute to the payment of any judgment in favor of Ventura. Ventura even failed to show a judgment in his favor could adversely affect Rosenblum's and Hubbard's employment with HarperCollins.

As a matter of basic evidentiary foundation, Ventura never established by direct evidence or reasonable inference that Rosenblum and Hubbard even knew about any insurance coverage or possible insurance payment. Rosenblum and Hubbard had no personal knowledge on the topic and were not qualified to testify on the subject. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Ventura's counsel argued in closing, "It's hard to believe that [Rosenblum and Hubbard] didn't know about the insurance policy because it's right in Kyle's publishing contract." The one-line mention of insurance

[825 F.3d 884]

contained in the lengthy small-print contract merely acknowledges HarperCollins "*may* carry" insurance. (Emphasis added). The publishing contract does not establish HarperCollins actually purchased insurance, much less that Rosenblum and Hubbard knew about it.

It is difficult to envision how Rosenblum and Hubbard could have been biased or even influenced by an insurance policy of which they were unaware. Even if they had been aware of a policy, any "connection" they had to the insurance carrier was far too remote to create a risk of bias strong enough to outweigh the substantial prejudice of Ventura's counsel's pointed and repeated references to unproven insurance.[5] See Fed. R. Evid. 403.

We now consider Ventura's counsel's statement during closing argument that HarperCollins's "*insurer is on the hook if you find that Jesse Ventura was defamed* " and "*Kyle is an additional insured for defamation under the publisher's insurance policy* ." (Emphasis added). As noted already, what insurer? What insurance policy?[6]

Ventura suggests Kyle's counsel did not "timely object[ ] during closing." We are not convinced Kyle's counsel's motion for a mistrial as soon as the jury was excused was necessarily untimely. See Lange v. Schultz , 627 F.2d 122, 127 (8th Cir. 1980) (" '[C]ounsel must either make an objection or ... move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel ... should[ ] make his objection, take his exception, or ask for remedial action at the close thereof and before the case is submitted to the jury.' " (quoting Thomson v. Boles , 123 F.2d 487, 495–96 (8th Cir. 1941) ("[N]o exception to [the closing] remarks was taken by the defendant either during the argument *or at its close* ." (emphasis added)))). However, Ventura did not object at trial to the timeliness of Kyle's motion for mistrial made after closing and instructions. The district court likewise did not question the motion's timeliness and instead ruled on the motion's merits, a general topic on insurance admissibility raised before, during, and at the end of trial. Ventura's timeliness argument now is itself untimely.7

[825 F.3d 885]

When deciding whether to grant a new trial due to improper remarks by counsel, we consider whether: (1) "the remarks in question 'were ... minor aberrations made in passing' "; (2) the district court took " 'specific curative action' "; and (3) " 'the size of the damage award ... suggest[s] that counsel's comment had a prejudicial effect.' " Gilster v. Primebank , 747 F.3d 1007, 1011–12 (8th Cir. 2014) (quoting Whittenburg v. Werner Enters. Inc. , 561 F.3d 1122, 1131–32 (10th Cir. 2009) ). " '[T]he weight of the evidence' is another relevant factor in determining 'whether the improper argument deprived a party of a fair trial.' " Id. at 1013 (quoting Stollings v. Ryobi Techs., Inc. , 725 F.3d 753, 760 (7th Cir. 2013) ).

Although relatively brief, Ventura's counsel's closing remarks about insurance " 'were not minor aberrations made in passing.' " Id. at 1011 (quoting Whittenburg , 561 F.3d at 1131 ). Given Ventura's repeated efforts to introduce evidence of HarperCollins's and Kyle's insurance at trial, it is difficult to see how Ventura's counsel's comments were anything other than "a deliberate strategic choice" to try to influence and enhance damages by referencing an impersonal deep-pocket insurer. Id. ("[W]e cannot say that this improper argument [counsel's vouching and sympathy-arousing personal experience] 'did not accomplish the purpose which it was clearly intended to accomplish, namely, the enhancement of damages.' " (quoting Whittenburg , 561 F.3d at 1132–33 )); cf. Indamer Corp. v. Crandon , 217 F.2d 391, 394 (5th Cir. 1954) (noting "defendant consistently sought to inject into the case the fact that the plaintiff had been protected by insurance"); Altenbaumer v. Lion Oil Co. , 186 F.2d 35, 36 (5th Cir. 1950) (per curiam) (observing references to insurance were "continuously brought" to the jury's attention, which was a "gravely prejudicial error" necessitating a new trial).

Second, the jury did not receive a specific curative instruction, only the general reminder that "arguments of counsel are not evidence." Gilster , 747 F.3d at 1012 (determining the "reminder that counsel's arguments are not evidence" was an insufficient curative instruction, particularly where the court overruled the defendant's contemporaneous objection). But see Jones v. Nat'l Am. Univ. , 608 F.3d 1039, 1048–49 (8th Cir. 2010) (citing "the district court's admonition to the jury prior to closing arguments that statements made by the attorneys are not evidence" as one factor supporting the decision to deny a new trial under the plain error standard).

Third, the jury awarded Ventura $500,000 in damages, which is probably " 'not beyond the bounds of rationality.' " Gilster , 747 F.3d at 1012 (quoting Whittenburg , 561 F.3d at 1132 ). Yet, as was the case in Gilster , "we cannot say that th[e] improper argument 'did not accomplish the purpose which it was clearly intended to accomplish, namely, the enhancement of damages.' " Id. (quoting Whittenburg , 561 F.3d at 1132–33 ).

Fourth, this was a close case that could have "go[ne] either way." Id. at 1013. After five days of deliberations, the jury could only reach an 8-2 verdict. Although there was extrinsic evidence suggesting the falsity of Kyle's assertions that he punched Ventura and police witnessed that altercation arising from the alleged statements, the trial essentially was a credibility contest between Ventura, Kyle, and their respective eyewitnesses.

[825 F.3d 886]

Finally, the risk of prejudice is high. In Halladay v. Verschoor , 381 F.2d 100, 112 (8th Cir. 1967), we explained it was "utterly repugnant to a fair trial or ... a just verdict" for the jury to hear that "the damages sued for ... will be taken care of by an insurance ... company." We observed that "it has been almost universally held that the receipt of such evidence constitutes prejudicial error sufficient to require reversal." *Id.* ; cf. Transit Cas. Co. v. Transamerica Ins. Co. , 387 F.2d 1011, 1013-14 (8th Cir. 1967) ("The fact that [the plaintiff] was reinsured and stood to bear only five percent of [its] loss is a fact that obviously would impress the jury, and might well lead it to return a defendant's verdict ... [and] [t]he interjection of the issue of reinsurance was prejudicial error.").

In light of this precedent, we must conclude Ventura's counsel's closing remarks, in combination with the improper cross-examination of two witnesses about Kyle's insurance coverage, prevented Kyle from receiving a fair trial. The district court clearly abused its discretion in denying a new trial. See, e.g. , Frymire-Brinati v. KPMG Peat Marwick , 2 F.3d 183, 188 (7th Cir. 1993) ("Collectively, ... [the errors] presented the jury such a skewed picture that the verdict is unreliable and must be set aside."); Malek v. Fed. Ins. Co. , 994 F.2d 49, 55 (2d Cir. 1993) (reversing judgment because "[a]lthough each of the erroneous evidentiary rulings ..., standing alone, may be insufficient to justify reversal, we cannot say that the cumulative effect is harmless"). But see SEC v. Infinity Grp. Co. , 212 F.3d 180, 196 (3d Cir. 2000) (rejecting cumulative error doctrine for civil cases). We remand the defamation claim for a new trial.[8]

**B. Unjust-Enrichment Claim**

Kyle argues the unjust-enrichment judgment is inconsistent with Minnesota law and would be prohibited by the First Amendment even if it did comport with Minnesota law. Kyle also asserts "Ventura presented no competent evidence Kyle was enriched." We agree Kyle was not unjustly enriched as a matter of Minnesota law, so we do not consider Kyle's constitutional arguments or review the district court's factual findings.[9]

[825 F.3d 887]

Under Minnesota law, "to prevail on a claim of unjust enrichment, a claimant must establish an implied-in-law or quasi-contract in which the defendant received a benefit of value that unjustly enriched the defendant in a manner that is illegal or unlawful." Caldas v. Affordable Granite & Stone, Inc. , 820 N.W.2d 826, 838 (Minn. 2012). We agree with Kyle that "Ventura cannot maintain a claim for unjust enrichment because he had no pre-existing contractual or quasi-contractual relationship with Kyle." See id. ("We have limited the application of unjust enrichment to claims premised on an implied or quasi-contract between the claimant and the party alleged to be unjustly enriched.").

Although Ventura is correct that "[a] quasi-contract will be imposed" where "a benefit was conferred unknowingly or unwillingly," we reject Ventura's assertion that Ventura conferred a "benefit" on Kyle by Ventura's mere existence as a colorful figure who might inspire people to make up stories about him. Galante v. Oz, Inc. , 379 N.W.2d 723, 725-26 (Minn. Ct. App. 1986). Ventura's unjust-enrichment claim is not allowed by Minnesota law.

Furthermore, even if Ventura had proven the other elements of unjust enrichment, the equitable remedy would still not be available because " 'there is an adequate remedy at law available' " for public figures—money damages for defamation.[10] Bame , 721 F.3d at 1030 (quoting ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc. , 544 N.W.2d 302, 305 (Minn. 1996) ). The district court concluded Ventura's legal remedy was inadequate because:

> damages available to [Ventura] on his defamation claim were limited to those necessary to remedy the injury to his reputation.... [T]he jury was expressly advised—*at [Kyle's ] behest* —that it could *not* award additional damages for unjust enrichment if it found that [Ventura's] "damages award for defamation ... provide[d] him with an adequate remedy".... [Ventura's] defamation claim provided him with no means to obtain the disgorgement of [Kyle's] ill-gotten gains.... [Ventura's] legal remedy was inadequate to fully ameliorate [Kyle's] wrongful conduct, and the defamation claim did not preclude the unjust-enrichment claim as a matter of law.

(Fifth insertion in original).

This conclusion was erroneous. First, whether there is an adequate remedy at law is a question of law, not a factual question for the jury. ServiceMaster of St. Cloud , 544 N.W.2d at 305. The jury, not aware of the legal/equitable distinction, likely would have interpreted "adequate" to mean "enough money." Even if the adequacy of the legal remedy were a proper question for the jury, we note the inconsistency in the jury's verdict. The jury determined $500,000 would "fairly and adequately" compensate Ventura for Kyle's defamation, but then suggested an award of approximately $1.35 million for unjust enrichment, which required the jury to find the opposite—that the defamation award was an inadequate remedy.

Second, as a matter of law, adequate legal remedies were available. Neither the district court nor Ventura cited any case awarding profits in a defamation case under an unjust-enrichment theory, or even suggesting money damages are an inadequate remedy in a public-figure defamation case. We find none. Cf.

[825 F.3d 888]

Silvercorp Metals Inc. v. Anthion Mgmt. LLC , No. 150374/2011, 36 Misc.3d 1231(A), WL 3569952, at *12 (N.Y. Sup. Ct. Aug. 16, 2012) (unreported) ("[T]he factual allegations supporting Silvercorp's unjust enrichment claim are identical to those giving rise to the defamation claim [and merge into the defamation claim]."). In one of the few cases addressing the issue, a New York state trial court observed:

> Libel has been [a] field of much litigation in both England and this country.... [I]t is significant that in none of these cases has an action such as is brought by the plaintiff in this case been instituted. The plaintiff recognizes this fact and states: "We are undertaking to prove additional facts never before pleaded in a libel suit, namely, that the defendant had and received money by virtue of his libellous publication." The absence of attempts to bring an action similar to the instant one is evidence of the recognition by the legal profession and the courts that such an action would not lie under the common law.

Hart v. E.P. Dutton & Co. , 197 Misc. 274, 93 N.Y.S.2d 871, 879 (N.Y. Sup. Ct. 1949) ; see also Milkovich v. Lorain Journal Co. , 497 U.S. 1, 23, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) ("[I]mperfect though it is, *an action for damages* is the *only* hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." (emphasis added) (quoting Rosenblatt v. Baer , 383 U.S. 75, 93, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966)

(Stewart, J., concurring))); Cason v. Baskin , 155 Fla. 198, 20 So.2d 243, 254 (1944) (en banc). In Minnesota, the defamation action generally applies to all "claims that arise as a consequence of ... purported defamatory statements." Mahoney & Hagberg v. Newgard , 729 N.W.2d 302, 310 (Minn. 2007).

We cannot accept Ventura's unjust-enrichment theory, because it enjoys no legal support under Minnesota law. Ventura's unjust-enrichment claim fails as a matter of law.

## III. CONCLUSION

We reverse the unjust-enrichment judgment and vacate and remand the defamation judgment for a new trial.

SMITH, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's reversal of the unjust-enrichment judgment. *See supra* Part II.B. However, I disagree with majority's decision to vacate and remand the defamation judgment for a new trial because of references to insurance in trial testimony and closing argument. *See supra* Part II.A.

In an eleven-day trial, the subject of insurance arose on the second day following the testimony of Taya Kyle ("Taya")—Kyle's widow. Ventura's counsel asked the court "to address ... the admissibility of the insurance policy that's applicable here" in light of Taya's testimony "that she's had to pay the expenses associated with this litigation"; "that if she gives the money away to charity, that she wouldn't be able to pay a judgment; and that if she gave the money away, she may not be able to feed her children as a result of this litigation." Ventura's counsel argued that courts addressing this issue "have found that this is an instance where an insurance policy should, in fact, be admitted to counteract testimony that is clearly inaccurate." Ventura's counsel explained that when presented with the "opportunity to do recross on Ms. Kyle, [he] plan[ned] to ask her about whether there is an insurance policy that, in fact, covers the legal expenses and will pay a judgment, because that is the case." Ventura's counsel sought "permission to raise the issue of insurance" in light of Taya purportedly opening the door to the subject. The court reserved ruling on the admissibility of insurance pending briefing from the parties.

[825 F.3d 889]

On the seventh day of trial, the court heard argument outside of the jury's presence concerning the admissibility of insurance. Ventura's counsel again argued that Taya should not be permitted to "'plead poverty if an insurance company is going to pick up the tab.'" But Ventura's counsel conceded that the insurance policy covered *only* the defamation claim, not the misappropriation and unjust-enrichment claims. In a written order, the district court denied Ventura's motion to question Taya regarding the insurance policy. The court concluded that "Taya Kyle's testimony did not open the door to evidence of insurance because her testimony was accurate—the insurance policy covers only the defamation claim, not unjust enrichment or misappropriation, and thus proceeds from *American Sniper* are at risk, as she testified."

Undaunted, the next day, Ventura's counsel acknowledged the court's ruling but made an offer of proof to preserve the issue for appellate review. Ventura's counsel proceeded to attempt to introduce, as part of that offer of proof, the insurance policy. "And related to that matter," Ventura's counsel asked the court's permission to "inquire [pursuant to Rule 411 ] as to the existence of insurance" with Rosenblum and Hubbard, HarperCollins representatives, because of those witnesses' purported "direct financial interests in this litigation" as representatives of the insured party. The court again reserved ruling on the

issue. When the court raised the issue later in the day, Kyle's counsel reiterated that the witnesses were "not affected by any insurance coverage at all" and that "if HarperCollins or th[ese] witness [es] were direct defendants, the introduction of any evidence regarding insurance would be just as off limits as it is against Mrs. Kyle. It would be completely inappropriate to delve into the question of insurance here." The court overruled Kyle's counsel's objection and permitted the inquiry, although it explained that the inquiry would not "be lengthy or in detail."

Thereafter, Ventura's counsel asked Rosenblum whether the witness was "aware that the legal fees for the estate's attorneys ... are being paid by the insurance company for HarperCollins." Rosenblum answered no. Ventura's counsel then asked whether Rosenblum was "aware that HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance." Rosenblum again answered no. During a sidebar conference, Kyle's counsel moved for a mistrial based on the "introduction of the insurance testimony." The district court denied the motion.

Ventura's counsel subsequently asked Hubbard, whether "you obtain insurance coverage in the case when an author may get sued for libel or defamation." Hubbard responded, "I don't know about that." Kyle's counsel objected based on relevance, and the court overruled the objection. Ventura's counsel then inquired whether the witness was "aware of any insurance provisions in [Kyle's publishing] contract." Kyle's counsel again objected based on relevance, and the court again overruled the objection. Hubbard answered, "I'm not aware."

On the final day of trial, during closing arguments, Ventura's counsel briefly highlighted[11] Rosenblum's and Hubbard's ignorance of an insurance provision in Kyle's publishing contract. Thereafter, the court orally instructed the jury. One of its general instructions was that "[q]uestions, objections, statements, and arguments of lawyers are not evidence in the case." The "[j]ury retired at 11:59 a.m." After dispensing

[825 F.3d 890]

with a couple routine matters, the court asked whether there was anything else that it needed to cover. At that point, Kyle's counsel moved for a mistrial based on Ventura's counsel's references to insurance in his closing argument. The district court denied the motion for mistrial. Court adjourned at 12:02 p.m.

Based on the record, I first conclude that the district court did not err in denying Kyle's motion for mistrial. Kyle's motion for mistrial after the retirement of the jury was untimely.

"When reviewing the denial of a motion for a new trial under Fed. R. Civ. P. 59(a), we give great deference to the district court's ruling and will not reverse in the absence of a clear abuse of discretion." *Brown v. Davis* , 813 F.3d 1130, 1138–39 (8th Cir. 2016) (citation omitted). We will reverse the district court's denial of a motion for new trial "only to prevent a miscarriage of justice." *Behlmann* , 794 F.3d at 963 (quotation and citation omitted). Likewise, we "will not disturb a trial court's denial of a motion for mistrial absent a clear showing of abuse of discretion." *Warger v. Shauers* , 721 F.3d 606, 609 (8th Cir. 2013) (quotation and citation omitted). Here, the district court's denial of the mistrial motion was not an abuse of discretion.

The majority concludes that "[w]e are not convinced Kyle's counsel's motion for a mistrial *as soon as the jury was excused* was untimely." *See supra* Part II.A (emphasis added) (citing *Lange* , 627 F.2d at 127 (citing *Thomson* , 123 F.2d at 495–96 )). *Lange* provides that "'counsel must either make an objection or ... move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel ... should[ ] make his objection, take his exception, or ask for remedial action at the close thereof and *before the*

*case is submitted to the jury* .' " 627 F.2d at 127 (emphasis added) (quoting *Thomson* , 123 F.2d at 495–96 ("[N]o exception to [the closing] remarks was taken by the defendant either during the argument or at its close.")).

The record shows that Kyle's counsel failed to make his motion for mistrial "before the case [was] submitted to the jury." *See id.* at 127. Here, the record clearly shows that the court gave oral instructions to the jury and that, after that charge, the "[j]ury retired at 11:59 a.m." Thus, the case was already "submitted to the jury" at 11:59 a.m. *before* Kyle's counsel moved for a mistrial based on improper closing argument. For that reason, I conclude that no timely objection was made. *See Lange* , 627 F.2d at 127.[12]

Second, I do agree with the majority that the district court erred in permitting Ventura's counsel's questions to HarperCollins's witnesses regarding insurance under Rule 411. The record contains no evidence that "Rosenblum and Hubbard had any economic tie or 'substantial connection' to HarperCollins's insurance carrier" and "Ventura never established by direct evidence or reasonable inference that Rosenblum and Hubbard even knew about insurance coverage or possible insurance payment." *See supra* Part II.A. But the

[825 F.3d 891]

district court's error does not automatically render a new trial necessary. "Rule 411 does not deal with the standard for reversal," which is an abuse of discretion. 23 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5369 (1980) (citing, *inter alia* , *Church Ins. Co. v. Trippe Mfg. Co.* , 250 Fed.Appx. 420, 422 (2d Cir. 2007) (abuse of discretion); *King v. Harrington* , 447 F.3d 531, 533 (7th Cir. 2006) (abuse of discretion)). In fact, "some courts have found minor violations of Rule 411 to be 'harmless error.' " *Id.* (citing *Nguyen v. Myers* , 442 S.W.3d 434, 440 (Tex. Ct. App. 2013) ).

> This interpretation is given some support by a former member of the Advisory Committee who has argued that reversals for violations of Rule 411 be limited "to those instances of gross mi[s]conduct in which counsel has made a deliberate and apparently successful attempt to prejudice the jury." In other words, reversal is required only when the injection of insurance has resulted in an excessive verdict.

*Id.* (footnotes omitted).

After reviewing the record, I conclude that any error in allowing Ventura's counsel to inquire about insurance was, at most, harmless and non-prejudicial. First, Ventura's counsel asked a total of four questions about insurance to two witnesses who disclaimed any knowledge about the subject during the course of an eleven-day trial. Second, the inquiry about insurance came *after* Taya first testified that she would be responsible for paying the judgment—at least as to the misappropriation and unjust-enrichment claims—were Ventura to prevail. Thus, the jury was on notice that Taya would be responsible for paying at least part of any judgment rendered against Kyle. Third, the issue of insurance did not permeate the entire trial; instead, in addition to the four questions asked of the HarperCollins witnesses, the only other references to insurance were the two statements in Ventura's counsel's hour-long closing argument. Fourth, the $500,000 in damages on the defamation claim is not an excessive verdict; as even the majority concedes, the verdict "is probably not beyond the bounds of rationality." *See supra* Part II.A. (quotations and citations omitted).

For these reasons, I conclude that the district court did not abuse its discretion in denying Kyle a new trial on the defamation claim.[13]

--------

Notes:

[1] Kyle was killed in 2013 and his wife Taya Kyle, as executor of his estate, was substituted as the defendant. We continue to refer to the defendant in this case as "Kyle."

[2] See 28 U.S.C. § 1332(a)(1).

[3] The jury instruction on the elements of defamation described the basis for the defamation claim as follows: "Plaintiff Jesse Ventura claims that Chris Kyle defamed him by asserting in American Sniper, as well as on television and radio, that Mr. Ventura said 'he hates America,' the SEALs 'were killing men and women and children and murdering,' and the SEALs 'deserve to lose a few.' " The jury was then instructed that Ventura was required to prove the "story" was "defamatory" and "materially false" and Kyle "published the story knowing it was false, believing it was false, or having serious doubts about its truth."

During deliberations, the jury asked, "when referring to Mr. Ventura's story (Punching Out Scruff Face) is the 'story' the sub-chapter or the 3 lines? ('he hates America,' 'we[']re killing men & women and children and murdering,' 'deserve to lose a few')." Over Kyle's objection, the district court responded, " 'The story,' as used in [the instructions] refers to the statements Mr. Kyle made about Mr. Ventura in the Punching Out Scruff Face subchapter and on television and radio, which include the three statements identified in your question. You are instructed to consider each element ... as to the story as a whole." Kyle argues these instructions were contradictory and leave unclear the basis for the defamation judgment, but we do not reach this assigned error because we conclude a new trial is warranted on other grounds.

[4] We need not decide Kyle's other assignments of error.

[5] The district court also concluded Taya Kyle "opened the door to [questions about insurance] by testifying about the financial impact of this litigation and her use of the book's proceeds," so-called "poor mouthing," Weiss v. La Suisse, Société D'Assurances Sur La Vie, 293 F.Supp.2d 397, 413 (S.D.N.Y. 2003). We respectfully disagree.

Taya Kyle only testified on redirect examination about her use of the book's proceeds after Ventura's counsel had cross-examined her about how much of the proceeds she had donated, insinuating she was insufficiently generous. Kyle's counsel attempted to rebut this insinuation by asking Taya Kyle whether "this lawsuit had any impact upon what you have done with the proceeds from American Sniper?" and "Would you be able to pay the Plaintiff?" We also note the district court correctly rejected Ventura's "poor-mouthing" argument only the day before, explaining in an order, "Taya Kyle's testimony did not open the door to evidence of insurance because her testimony was accurate—the insurance policy covers only the defamation claim, not unjust enrichment or misappropriation, and thus proceeds from American Sniper are at risk, as she testified." It also is confusing how Taya Kyle's purported "poor-mouthing" "opened the door" to the cross-examination of *other* witnesses about HarperCollins's insurance policy, particularly witnesses so disconnected and with no personal knowledge on the subject. Cf. Fed. R. Evid. 602.

[6] From our review, these unsupported, improper, and prejudicial statements were not heat of the moment argument, but were strategic and calculated.

[7] The dissent concludes the district court did not err in denying Kyle's motion for mistrial because the motion made "after the retirement of the jury was untimely." Post at 890. The district court did not deny the motion because it was untimely. What is untimely is Ventura's timeliness argument on appeal—not preserved in the district court—and it should not be addressed in the first instance on the appeal of this case. See, e.g., Wever v. Lincoln County, Neb., 388 F.3d 601, 608 (8th Cir. 2004) ("Ordinarily, this court will not consider arguments raised for the first time on appeal.").

[8] We note the complications that can arise when a general verdict form is used in public-figure defamation cases. See, e.g., Greenbelt Co-op. Pub. Ass'n v. Bresler, 398 U.S. 6, 11, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) ; West v. Media Gen. Operations, Inc., 120 Fed.Appx. 601, 602, 619 (6th Cir. 2005) (unpublished) (collecting cases).

[9] The district court concluded Kyle forfeited any challenge to the unjust-enrichment judgment because Kyle filed a motion for judgment as a matter of law with the district court under Federal Rule of Civil Procedure 50, which governs issues tried to a jury, not Federal Rule of Civil Procedure 52, which governs actions tried without a jury or with an advisory jury. The district court stated that, even if it were to treat Kyle's motion as a Rule 52 motion, Rule 52 applies only to factual findings, whereas Kyle raised legal arguments.

We cannot agree with the district court's conclusion that Kyle improperly attempted to "advance new theories" in his motion for judgment as a matter of law because he waited until after the trial to argue that equitable remedies such as unjust enrichment are not available when adequate legal remedies exist. Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1219 (5th Cir. 1986). Kyle raised this point in his trial brief. He also raised several arguments for why Ventura's unjust-enrichment claim failed as a matter of law in both of his motions for summary judgment, his trial brief, and his reply trial brief. See Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 715–16 (8th Cir. 2008) (finding a "lengthy footnote" in the plaintiff's brief in opposition to the defendant's motion to amend its answer was "sufficient to avoid waiver on appeal"). On the record in this case, we conclude Kyle has preserved the issue.

10 The unjust-enrichment award cannot be based on Ventura's misappropriation claim because, although Ventura did not prevail, an adequate legal remedy was *available.* Cf. United States v. Bame, 721 F.3d 1025, 1031–32 (8th Cir. 2013).

11 The district court permitted each side an hour for closing arguments. Ventura's counsel's closing argument covers approximately 30 pages of transcript.

12 Although Ventura did not object to Kyle's motion for mistrial based on untimeliness, "we may affirm [the district court's denial of the motion for mistrial] for any reason supported by the record, even if different from the reasons given by the district court." *Robbins v. Becker* , 794 F.3d 988, 992 (8th Cir. 2015) (quotation and citation omitted); *see also Emery v. Am. Airlines, Inc.* , No. 15–10100, 2016 WL 1425939, at *3 (11th Cir. Apr. 12, 2016) ("Because the district court issued a summary order, it is not apparent from the face of the order that the motion was denied as untimely. We nevertheless may affirm the district court's decision for any reason supported by the record, even if not relied upon by the district court." (citation omitted)).

13 Because the majority vacates and remands the defamation judgment for new trial based on the references to insurance in trial testimony and closing argument, the majority does not address Kyle's additional arguments that Kyle is entitled to a new trial on the defamation claim because the district court failed to instruct the jury that Ventura had to prove material falsity by clear and convincing evidence and Ventura failed to establish actual malice. On remand, these issues will likely be raised again. Out of an abundance of caution, I decline to issue an advisory opinion on the merits of these questions.

--------

 Live Chat



City of Omaha
Jean Stothert, Mayor

**Law Department**
Omaha/Douglas Civic Center
1819 Farnam Street, Suite 804
Omaha, Nebraska 68183-0804
(402) 444-5115
FAX: (402) 444-5125

**Paul D. Kratz**
City Attorney

April 14, 2020

SENT VIA EMAIL TO: nelson@ned.uscourts.gov

Hon. Michael D. Nelson
U.S. Magistrate Judge
111 S. 18th Plz., #2210
Omaha, NE 68102

Re: Chalepah v. City of Omaha, et al.

Dear Judge Nelson:

This correspondence is in response to Plaintiffs' request for a hearing regarding discovery disputes. As you will recall after the last telephone conference, the Court allowed the Plaintiff to send discovery to the individual defendants although the discovery deadline had passed. The Court made it clear that the discovery requests were to be the same as what was requested of the City and not an entirely new round of requests. In response, Plaintiff propounded 11-18 additional requests to each of the five individual defendants. Many of those requests were "new" requests and were not the requests previously made to the City. Therefore, the Defendants have objected to those because they are beyond the scope of what the Court allowed in this second round of discovery.

As of 3:45 p.m. on Tuesday, April 14, 2020, Plaintiff has not prepared a list of what is still in dispute, so Defendants will respond to everything they are aware of.

RFP #40—Plaintiff has asked for "all materials that document a professional relationship between all designated experts and AXON/TASER International, whether the connection is through current or former employment, research, publication of articles, financial payments, stock ownership, position on advisory boards expert witnesses, or training officers, in an electronic format. This request includes the production of tax records which document any type of financial payments or stock ownership." Defendants have objected to this request. Expert witness discovery is defined by F.R.Civ.P. 26(a)(2) and (b)(4). As discussed by Magistrate Zwart, from the District of Nebraska in *Morriss v. BNSF Ry Co.,* 2014 WL 128393 *6, No. 8:13cv24 (1/13/14), "[t]he expert disclosure and discovery limitations of Rule 26 represent a reasoned balance between sufficient expert disclosures and unfettered expert discovery as expressed in case law and the document discussions of the Rules Committee. As referenced repeatedly in the advisory notes to rule 26, the provisions of the rules were adopted to limit the undue burden and cost of expert discovery." RFP #40 seeks information beyond the expert report and disclosures of Rule 26 and should not be allowed.

Plaintiff propounded a request to all defendants (different numbers) asking that they "Produce all electronic mail sent and/or received by you and OPD officer or any other individual defendants named in this lawsuit after June 4, 2017...." Defendants stand by their objections to these requests because it is

beyond the scope of the discovery allowed by this court. Plaintiff alleges that this request is related to previous RFP #17, but RFP #17 requested the City "Produce all hard-copy and email correspondence s sent to the Omaha Police Department/ City of Omaha by TASER..." However, these requests are only "related" insofar as they both ask for emails.

Similarly, Plaintiff requested all individual defendants (different numbers) to "Provide cell phone billing records after June 4, 2017, that include but is not limited to, the phone number, billing address, account number, call logs and name of the service provider that you were using while employed as a police officer...." Defendants again object based on the fact that this request goes beyond the Court's order. Plaintiffs argue these requests are related to previously sent RFP #12 and #43. No. 12 asks for "all text messages received from Brogan Cordova specifically. This request also includes all other text messages collected during the course of the In-Custody Death investigation for the specific purpose of the Bear Heel's death investigation." RFP #43 requests that the City "Produce all phone records collected by OPD during the course of the OII Investigation of Zachary Bear Heels in an electronic format." Again, these requests again are only related insofar as phone records are requested. The requests to the individual defendants go far beyond the original requests.

Plaintiff has asked certain individual defendants (McClarty RFP #14 and Payne RFP #18) to produce the TASER wire and barb taken from the rescue squad. Defendants object on two grounds. First this request was not previously made. Secondly, it presupposes that the wires and/or barb were taken nefariously for which there is absolutely no evidence to suggest that such a thing took place.

It Defendants' understanding and belief that the issues of the arbitration transcripts and exhibits have been resolved. The City will produce the full polygraph report for Sgt. Forehead.

Thank you for your consideration of these matters and we look forward to resolving them during tomorrow's teleconference.

Sincerely,

Michelle Peters

Michelle A. Peters
Deputy City Attorney

Cc: Garvin Isaacs, Debbie Maddox, Tom White